# PITTSBURG AND SOUTHERN COAL COMPANY *v.* LOUISIANA.

ERROR TO THE SUPREME COURT OF THE STATE OF LOUISIANA.

No. 10. Argued January 10, 11, 1895. — Decided March 4, 1895.

No. 147 of the Laws of Louisiana of July 12, 1888, providing for the appointment of coal and coke boat gaugers and making it compulsory upon all persons selling coal or coke in a barge to have the same inspected and gauged according to the provisions of that act, is not a regulation of commerce; nor does it lay an impost or duty upon imports or exports from or to other States and Louisiana ; nor is such legislation forbidden by the act of February 20, 1811, c. 21, 2 Stat. 641, providing for the admission of Louisiana into the Union; nor does it work an unconstitutional discrimination between the coal of Pennsylvania and the coal of Alabama, coming into Louisiana.

On the 12th July, 1888, the legislature of Louisiana passed an act for the appointment of two coal and coke boat gaugers, to fix their compensation, and define their duties. No. 147, Laws of 1888, page 207. It provided that they should be appointed by the governor of the State, with the approval and consent of the Senate, to hold their offices in the city of New Orleans, with a proviso that the governor should have the power to remove any one of them upon satisfactory proof to him of negligence and official misconduct. The act further provided that each of the gaugers should give a bond payable to the governor, or his successor in office, with two sufficient sureties in the penal sum of five thousand dollars, conditioned for the faithful performance of his duties. The act declared that it should be the duty of the gaugers, when called upon for that purpose, to gauge any coal or coke boat or barge in the port of New Orleans or the State of Louisiana; that such gauging should consist in reducing the length, breadth, and depth, inside measurement, of boats or barges, deducting all obstructions and displacements, into cubic inches and dividing the cubic inches by twenty-six hundred and eighty-eight, thus

ascertaining the net measurement in bushels; and that two bushels and six-tenths of a bushel should·constitute a barrel; that in all cases it should be the duty of 'the gaugers, or either of them, to respond promptly to any call made for their or either of their services, and to furnish a full and detailed certificate of the gross measurement of the boat or barge gauged and the allowance for obstructions or displacements; that the fee for gauging or regauging should be ten dollars for each boat, and five dollars for each barge, to be paid by the seller, except as subsequently provided; that the purchaser of any boat or barge of coal or coke should have the privilege of calling upon the said gauger or gaugers to regauge boats or barges, in all cases where the original gauge was not satisfactory, and such regauge should be adopted as the correct measure; that if the original gauge should be found to be correct, then the purchaser should pay the fee for regauging; but if the regauge should show a less measure, then the seller should pay the fee.

The law also declared that no boatload of coal or coke should be sold in the city or State until it had been inspected, as provided for in the act, and that any person who should sell a boatload of coal or coke that had not been gauged as required should be liable to a penalty of fifty dollars for each boat or barge thus sold, to be recovered, with costs of suit, in any·court of competent jurisdiction, for the benefit of the Charity Hospital of New Orleans.

The term of office of said gaugers was made four years, the act to take effect from its passage.

The present action was brought by the State of Louisiana against the Pittsburg and Southern Coal Company, a corporation organized under the laws of Pennsylvania, and domiciled in the city of Pittsburg, of that State, in which it was a citizen, to recover the penalty of fifty dollars for selling in New Orleans one boatload of coal in violation of section eight of the act. It was commenced in the First City Court of New Orleans by the attorney general of the State for the use of the Charity Hospital of the city.

The defendant appeared by counsel and answered, alleging, besides, that it was a corporation under the laws of Pennsyl-

vania and domiciled in the city of Pittsburg in that State and a citizen thereof, that its business was that of coal mining, buying and selling coal and coke, that coal and coke were the products of the State of Pennsylvania, and were, by respondent, loaded in boats and barges on the Ohio and Mississippi Rivers, and navigated down to the South on those rivers and sold to purchasers along the banks thereof and of their various southern tributaries; that it every year sends down the Mississippi River, a navigable river of the United States, a number of barges and boats with cargoes of coal, and moors the same in the river, retaining them, as the property of the respondent, in the vessels in which they are brought down the rivers to the city of New Orleans and other points, and holds the same until they are sold to its customers, which is the object with which the boats and barges are loaded and navigated from the State of Pennsylvania to the State of Louisiana and other States, the vessels always remaining on the navigable waters of the United States and sold thereon.

Respondent averred that the demand herein made was by virtue of act No. 147 of the acts of 1888 of the State of Louisiana, and that the coal boat No. 1098, for selling which a penalty of fifty dollars was claimed, had been gauged by gaugers employed by the respondent, and that the boat, at the time of sale, was upon the Mississippi River, a navigable stream of the United States, within the jurisdiction of the United States, and the measurement thereof made by the gaugers was in accordance with section four of the act; and that the firm of W. G. Coyle & Company, to whom the boat of coal and coke had been sold, were satisfied with the measurement, and desired no further measurement thereof, and no certificate of the amount of coal therein; that the price was agreed on between the respondent and W. G. Coyle & Company, and any further gauging of the boat and coal was totally unnecessary, uncalled for, and would have been productive of no good or benefit to anybody.

Respondent further averred that the coal boat No. 1098 was laden with a cargo of coal which was mined in Pennsylvania, and was by the respondent navigated down the Ohio and Mis-

sissippi Rivers to a point or place thereon within the boundaries of the State of Louisiana, for the purpose of selling the vessel and cargo upon the river in pursuance of the trade or commerce which is carried on by respondent thereon and within the body of the various States through which it flows between Pennsylvania and the Gulf of Mexico.

The respondent further averred that the act No. 147 of 1888, making the gauging of the boat compulsory and exacting ten dollars on each boat sold in Louisiana, under which the attorney general, in the name of the State, proceeded, was contrary to the constitution of the State of Louisiana, and void upon various grounds, four of which were based upon the alleged repugnance of the act to certain provisions of the constitution of the State. These were not considered, as they were deemed immaterial to the disposition of the case. The other grounds were as follows:

1. That it was in violation of article one, section ten, of the Constitution of the United States, in that it impaired the obligation of a contract in this, that respondent had paid to the State of Louisiana the sum of two hundred and fifty dollars as a license for permission to carry on its business of selling coal and coke within the State; that the two hundred and fifty dollars being accepted by the State of Louisiana and the city of New Orleans and a license issued to the respondent thereunder, the same constituted a contract between the respondent and the State and the city, which has also issued a license to the respondent in payment of the sum, giving to them the right to sell coal and coke in the city and State during the year 1888 without further opposition or hindrance or imposition of any charge or claim or impost on the part of the State or city; that the license was obtained and granted by the State and the city prior to the passage of act No. 147 of the regular session of 1888.

2. That it was in violation of section ten of article one of the Constitution of the United States, in that it seeks to lay an impost or duty on imports in the State of Louisiana from the State of Pennsylvania, which was not necessary for the execution of any inspection law.

3. That it was in violation of the Fifth Amendment to the Constitution of the United States.

4. That it was in violation of section one of the Fourteenth Amendment of the Constitution of the United States.

5. That it was in violation of section eight of article one of the Constitution of the United States in that it was a regulation of commerce among the several states, and it sought to regulate upon the Mississippi River the sale of the vessels and coal of respondent, which are the subjects of commerce and trade carried on by the respondent on the river between the State of Pennsylvania and other States of the Union and foreign countries.

The respondent averred that the act was repugnant to the provisions of the Constitution of the United States and the laws thereof, in that it was a discrimination against imports brought into the State of Louisiana, in boats upon the navigable waters of the United States in favor of those brought in by land to the State; in that it subjected the one to the payment of duties, imposts, and exactions set forth in the act which were not imposed upon those brought in by land.

Respondent averred that the act discriminated against coal and coke, the produce of the State of Pennsylvania, in favor of the coal and coke, the produce of the State of Alabama.

That the act was an oppressive and unwarrantable interference with the right of citizens freely to contract and carry on trade and commerce, and contrary to individual liberties.

Wherefore the respondent prayed that the act No. 147 of 1888 be decreed contrary and repugnant to the constitution of the State of Louisiana and of the United States, and therefore null and void, and that judgment be rendered rejecting the plaintiff's demand, and dismissing the respondent with costs.

The testimony was then taken both on the part of the defendant and the plaintiff.

It was admitted that the coal sold was the property of the defendant; that it was sold to W. G. Coyle & Co. on the 30th of August, 1888; that it was gauged by a professional coal-boat gauger, but not one of the two appointed by the State

under the statute, and that the method employed by him was that described in the statute, and that no application was made to the state gaugers appointed under that act, and the boat was never gauged by them.

The agent of the Pittsburg and Southern Coal Company testified that the domicil of the corporation was at Pittsburg, Pennsylvania; that its business consisted in selling coal in the Southern markets, and that the business was carried on by wholesale in boats and barges on the river, the barges containing about 400 to 450 tons, and the boats from 900 to 950 tons; that the boats were loaded with Pittsburg coal on the Ohio and Mississippi Rivers, and on arrival in Louisiana were sold to dealers, planters, and other purchasers, but in no quantity less than a boat or barge load; that they were gauged by a regular gauger employed by the company; that the boat, for selling the load of which the penalty was claimed, came from Pittsburg, and was the property of the Pittsburg and Southern Coal Company; that it was sold to W. G. Coyle & Co., of New Orleans, and was gauged by a gauger employed by the company, and by the system adopted by the state law; that Coyle & Co. made no objection to the gauge of the boat, required no certificate from the state officers, and no such certificate would have been of any benefit or advantage to either party to the transaction; that there was some competition in the trade in coal from Alabama, which came by rail, and that very small quantities also came from Tennessee; that there was no coal produced in Louisiana, and that the agent had taken out a license as a wholesale coal dealer for that State for the year 1888.

The trial court rendered judgment in December, 1888, rejecting the demand of the state. It proceeded upon the ground that the employment of the State gaugers was not compulsory; that in the case at bar the boat was gauged by the very standard required by the Louisiana statute; that the measurement was satisfactory to both the vendor and the purchaser, and that the only complaint of the State being that the state gaugers had not been employed, the defendant had not violated the act.

From this judgment appeal was taken to the Supreme Court of the State.

That court reversed the judgment of the trial court and condemned the defendant to pay to the State for the benefit of the Charity Hospital of New Orleans the penalty of fifty dollars imposed by section eight of the statute in question. It proceeded upon the ground that the gauging by the state inspectors was compulsory, and that the statute attacked was not in conflict with the constitution either of the State or of the United States.

To reverse that judgment the present writ of error was prosecuted.

The plaintiff assigns the following as errors of the Supreme Court:

1. In sustaining the statute of Louisiana, that being in conflict with that clause of the Constitution of the United States which declares that Congress shall have the power "to regulate commerce with foreign nations and among the several States and with the Indian tribes;"

2. In sustaining the statute of Louisiana because it was in conflict with that clause of the Constitution of the United States which provides that "no State shall, without the consent of the Congress, lay any imposts or duties on imports or exports except what may be absolutely necessary for executing its inspection laws, and the net produce of all duties and imposts laid by any State on imports or exports shall be for the use of the Treasury of the United States, and all such laws shall be subject to the revision and control of the Congress;"

3. In sustaining the statute of Louisiana which was in conflict with that portion of the act of Congress entitled "An act to enable the people of the territory of Orleans to form a constitution and state government, and for the admission of the State into the Union on an equal footing with the original States, and for other purposes," which provided: "That the river Mississippi and the navigable rivers and waters leading into the same or into the Gulf of Mexico shall be common highways and forever free, as well to the inhabitants of the

said State as to other citizens of the United States, without any tax, duty, impost, or toll therefor, imposed by the said State;" and

4. In sustaining the statute of Louisiana which is in conflict with that portion of the act of Congress which provides: "That it shall be taken as a condition upon which the said State is incorporated in the Union, that the river Mississippi and the navigable rivers and waters leading into the same and into the Gulf of Mexico shall be common highways and forever free, as well to the inhabitants of the said State as to the inhabitants of other States and the Territories of the United States, without any tax, duty, impost, or toll therefor imposed by the said State; and that the above condition, and also all other the conditions and terms contained in the third section of the act, the title whereof is hereinbefore recited, shall be considered, deemed, and taken fundamental conditions and terms upon which the said State is incorporated in the Union."

*Mr. W. S. Benedict* and *Mr. George A. King* for plaintiff in error. *Mr. Charles W. Hornor* was on their brief.

*Mr. George Gray* for defendant in error.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

There is nothing in the provisions of the act of Louisiana providing for the appointment of two gaugers of coal and coke boats, which can properly be considered as regulations of commerce, in conflict with the power vested in Congress over the subject. They only prescribe the rule by which the capacity of the carrying vessels of coal and coke can be determined, and the weight of the coal or coke carried ascertained, which may be readily done at any time. They were adopted for the convenience of the owners of the boats and loads. They are properly to be regarded as a part of those innumerable police regulations which every State may enact for the convenience and comfort of its inhabitants in the conduct of their business.

They do not add to the increase or to the diminution of the productions of the State or to the facility of their transportation or of their loading or landing. They may in some cases in a slight degree affect commerce, but not to such an extent or in such a sense as to be properly designated as regulations of commerce.

As this court said in *Smith* v. *Alabama*, 124 U. S. 465, 473: " There are many cases, however, where the acknowledged powers of a State may be exerted and applied in such a manner as to affect foreign or interstate commerce without being intended to operate as commercial regulations. If their operation and application in such cases regulate such commerce, so as to conflict with the regulation of the same subject by Congress, either as expressed in positive laws or implied from the absence of legislation, such legislation on the part of the State, to the extent of that conflict, must be regarded as annulled. To draw the line of interference between the two fields of jurisdiction, and to define and declare the instances of unconstitutional encroachment, is a judicial question often of much difficulty, the solution of which, perhaps, is not to be found in any single and exact rule of decision. Some general lines of discrimination, however, have been drawn in varied and numerous decisions of this court. It has been uniformly held, for example, that the States cannot by legislation place burdens upon commerce with foreign nations or among the several States. 'But upon an examination of the cases in which they were rendered,' as was said in *Sherlock* v. *Alling*, 93 U. S. 99, 'it will be found that the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce, or exacted a license from parties engaged in commercial pursuits, or created an impediment to the free navigation of some public waters, or prescribed conditions in accordance with which commerce in particular articles or between particular places was required to be conducted. In all the cases the legislation condemned operated directly upon commerce, either by way of tax upon its business, license upon its pursuit in particular channels, or conditions for carrying it on.' In that case it was held that a statute of Indiana, giving a

right of action to the personal representatives of the deceased where his death was caused by the wrongful act or omission of another, was applicable to the case of a loss of life occasioned by a collision between steamboats navigating the Ohio River engaged in interstate commerce, and did not amount to a regulation of commerce in violation of the Constitution of the United States.    On this point the court said (p. 103): 'General legislation of this kind, prescribing the liabilities or duties of citizens of a State, without distinction as to pursuit or calling, is not open to any valid objection because it may affect persons engaged in foreign or interstate commerce. Objection might, with equal propriety, be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to the contracts or estates of persons engaged in such commerce.    In conferring upon Congress the regulation of commerce it was never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.    Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution.  .  .  .    And it may be said, generally, that legislation of a State, not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit.' "

We do not think that the statute of Louisiana was in conflict with the commercial power of Congress prescribed by the Constitution, and the Supreme Court of Louisiana did not err, therefore, in sustaining it.    It provided only a regulation for the measurement of the coal and coke boats on the Mississippi, and of the coal and coke carried, which neither increased nor impaired the commerce of the country in the carrying form of the boats or in the coal and coke carried.

Nor do we perceive that the statute of Louisiana in any respect lays an impost or duty on imports or exports from Pennsylvania and Louisiana. The terms "imports" and "exports" apply only to articles imported from foreign countries or exported to them. The inhibition imposed is the laying of duties on imports from foreign countries, and not on such as came from one State to another. This was directly held in *Woodruff* v. *Parham*, 8 Wall. 123. The exception from this restriction from levying a tax on imports and exports is confined to such as may be absolutely necessary to execute the inspection laws.

Nor do we perceive that there is any inhibition to the statute of Louisiana in the act approved February 20, 1811, c. 21, 2 Stat. 641, enabling the people of the Territory of Orleans to form a constitution and state government and for the admission of the State of Louisiana into the Union on an equal footing with the original States, or in the act of Congress which provides, as the unalterable condition on which the State of Louisiana was admitted into the Union, that the river Mississippi and the navigable rivers and waters leading into the same or into the Gulf of Mexico shall be common highways and forever free, as well to the inhabitants of said State as to other citizens of the United States, without any tax, duty, impost, or toll therefor imposed by the said State. The tax, duty, impost, or toll thus referred to and thus prohibited are such as are directed against the commerce of the rivers, and not such as are imposed by any regulation for convenience in the measurement or storage of coal or coke carried. The freedom contemplated is that which would be destroyed by denying equality of right to any particular class of vessels or mode of navigating the Mississippi and other rivers leading into the Gulf of Mexico. All such rivers are to be deemed highways and equally open to all persons who choose to pursue commerce upon them.

Nor is there any discrimination in the transportation of the coal and coke from Alabama and that from Pennsylvania, as in any respect impairs the efficiency of the laws of Louisiana. The difference between the transportation of the coal and coke from Pennsylvania and from Alabama is only the difference

arising from one being transported by water and the other by land. There is a difference arising between water and land carriage, arising from the nature of the two modes, but not one created by legislation, direct or indirect, or by any efforts of the state legislature to give or recognize a discrimination in the case of either.

*Judgment affirmed.*