[No. 26052. *En Banc.* July 9, 1936.]

THE STATE OF WASHINGTON, *on the Relation of Foss Company et al., Appellants,* v. E. PAT KELLY, *as Director of the Department of Labor and Industries, et al., Respondents.*[1]

*John S. Robinson,* for appellants.

*The Attorney General* and *W. A. Toner, Assistant (Daniel Baker,* of counsel), for respondents.

TOLMAN, J.—The appellants, as plaintiffs, by this action sought the issuance of a writ of prohibition to prevent the defendants from in any manner enforcing or attempting to enforce chapter 200, Laws of 1907, p. 425 (Rem. Rev. Stat., § 9843 [P. C. § 2880] *et seq.*), as against them. From a judgment of dismissal, entered after trial on the merits, the plaintiffs have appealed.

[1]Reported in 59 P. (2d) 373.

The material facts are now very little in dispute and may be briefly summarized as follows: The appellants own and operate one hundred thirty-nine motor driven tugs, of which one hundred eleven are less than sixty-five feet in length. Some of these tugs are registered, and the remainder are all enrolled and licensed under Federal laws. For the most part, these tugs are employed in intrastate commerce, but some tow to and from British Columbia ports and some tow back and forth across the Columbia river, or from other ports in Washington to ports in Oregon. Practically all of these tugs are capable of engaging in interstate or foreign commerce and will do so if and when opportunity offers. Some of the larger tugs have towed and will tow to California ports. The main business, however, of most of the tugs is confined to moving vessels engaged in interstate and foreign commerce, and other work in and about the harbors where they are stationed.

The United States government has for many years maintained a steamboat inspection service, but neither that nor any other Federal agency has been empowered by Federal legislation to inspect motor driven tugs for seaworthiness or as to the condition of their mechanical equipment, or to license the officers who operate them.

Chapter 200, Laws of 1907, p. 425 (Rem. Rev. Stat., § 9843 [P. C. § 2880] *et seq.*), is a comprehensive and complete code for the inspection and regulation of every vessel operated by machinery which is not subject to inspection under the laws of the United States.

It is charged by the complaint and admitted by the answer that, unless prohibited, the department and its officials will (1) enforce as against the appellants and their vessels the provisions of § 9, p. 431 (Rem. Rev. Stat., § 9851 [P. C. § 2888]), of the act referred

to, relating to signal lights; and (2) that appellants will be proceeded against for penalties unless, among other things, they will do the following:

"(a) Submit such vessels to inspection annually or oftener if the director shall deem it reasonable, at a cost to said owners of not less than five nor more than twenty dollars for each inspection.

"(b) Make such changes, repairs and improvements as said director may thereupon require.

"(c) Carry such officers on said vessels as the director shall after examination license as masters, pilots, and engineers.

"(d) Carry such crews as he shall deem necessary to manage each vessel with safety.

"(e) Carry such life saving equipment as he shall require and approve.

"(f) Carry such fire prevention apparatus as he shall require and approve.

"(g) Keep on board at all times a copy of the license to be issued by the director authorizing the vessel to navigate in and upon the waters within the territorial limits of the state, the same to be posted in a conspicuous place.

"(h) Keep a copy of the first twenty-two sections of the act posted in a conspicuous place on said vessel.

"(i) Keep two copies of the navigation rules set out in section 8 of the act posted in the vessel, one in the pilot house, the other in a conspicuous place.

"(j) Keep the vessel's name painted on her stern in the character and colors prescribed by section 16 of the act.

"(k) Comply with all orders, regulations and requirements of the commissioner (Sec. 25)."

The appellants' main contentions are (1) that Congress has exclusive power to make laws for the government of foreign and interstate commerce, which includes the power to make rules governing navigation upon the navigable waters of the United States; that, as to some things, its power is absolute and exclusive, and as to others, where there is a concurrent

power, legislation by the state must give way when Congress has occupied the field, whether such legislation conflicts with Federal legislation or not; and (2) that therefore the state had no right to legislate as to most of the provisions of the act in question. Some other questions are presented, which, however, it does not appear necessary to consider.

There are lakes within the state which are navigable. These are land-locked, and both sides agree that the state has exclusive jurisdiction of all matters pertaining to the navigation thereon, and that this act of the legislature may and does apply to all vessels operating on such land-locked waters.

Within or adjacent to the boundaries of the state, are also navigable waters known as inland waters, over which the Federal government has control, and the high seas, over which the Federal control is limited by international rules which our government has adopted by agreement with other maritime nations.

While the appellants' tugs mostly operate in inland waters, some go upon the high seas; and, in any event, if the state may not legislate in the manner here disclosed with reference to operations in inland waters, of course it cannot do so with reference to operations upon the high seas.

The Federal legislation with respect to vessels and navigation in navigable waters is of vast extent, and seemingly it covers every situation and condition which the Congress has considered to be necessary or advisable to cover. Even row boats are required to carry a lantern showing a white light to be exhibited under certain conditions. U. S. C. A., Title 33, § 77.

All of the vessels involved in this case, whether registered or enrolled and licensed to engage in the coastwise trade, come under the Federal legislation.

Motor-boats not more than sixty-five feet in length are defined and regulated by chapter 16, Title 46, U. S. C. A. True, that chapter does not require inspection for seaworthiness or the examination and licensing of officers, but, presumably, Congress went as far in the regulation of such boats as it thought to be necessary.

"This doctrine of a general concurrent power in the states, is insidious and dangerous. If it be admitted, no one can say where it will stop. The states may legislate, it is said, wherever congress has not made a plenary exercise of its power. But who is to judge whether congress has made this plenary exercise of power? Congress has acted on this power; it has done all that it deemed wise; and are the states now to do whatever congress has left undone? Congress makes such rules as, in its judgment, the case requires; and those rules, whatever they are, constitute the system." *Gibbons v. Ogden,* 22 U. S. 1, 6 Law Ed. 23.

Upon this question of occupancy of the field, the railroad cases seem to be in point and to support our view that Congress has here occupied the field. *Northern Pac. R. Co. v. Washington,* 222 U. S. 370, 32 S. Ct. 160, and *Southern R. Co. v. Railroad Commission of Indiana,* 236 U. S. 439, 35 S. Ct. 304.

The exception to this rule, if it be an exception, seems to be with reference to state legislation affecting pilots and pilotage. In *Cooley v. Board of Wardens of Port of Philadelphia,* 53 U. S. 298, the Federal supreme court upheld legislation by the state of Pennsylvania on this subject on the ground, apparently, that, though Congress had the power to regulate, and when a uniform rule was necessary that power was exclusive, yet as to pilotage, uniformity was not necessary and the states might act. It was there said:

"This provision of the Constitution was intended to operate upon subjects actually existing and well understood when the Constitution was formed. Imposts and duties on imports, exports, and tonnage were then known to the commerce of a civilized world to be as distinct from fees and charges for pilotage, and from the penalties by which commercial states enforce their pilot-laws, as they were from charges for wharfage or towage, or any other local port-charges for services rendered to vessels or cargoes; . . . it also follows, that this law is not repugnant to the first clause of the eighth section of the first article of the Constitution, which declares that all duties, imposts, and excises shall be uniform throughout the United States; for, if it is not to be deemed a law levying a duty, impost, or excise, the want of uniformity throughout the United States is not objectionable. Indeed the necessity of conforming regulations of pilotage to the local peculiarities of each port, and the consequent impossibility of having its charges uniform throughout the United States, would be sufficient of itself to prove that they could not have been intended to be embraced within this clause of the Constitution; for it cannot be supposed uniformity was required, when it must have been known to be impracticable."

This court in *State v. Ames*, 47 Wash. 328, 92 Pac. 137, recognized the right of the state to legislate on the subject of pilotage and gave the reason as being that Congress had not attempted to regulate the whole subject of pilotage.

Whether this court, in the *Ames* case, *supra,* gave the correct reason for sustaining state legislation on the subject of pilotage, is not particularly material. Whichever reason be the true one, pilots and pilotage alone seem to stand out as affording a field for state legislation.

We have not overlooked the case of *Stewart & Co. v. Rivara*, 274 U. S. 614, 47 S. Ct. 718, where a state

law as to conditional sales contracts was upheld. The court there pointed out:

"Clearly there is nothing in the state law to interfere with the use of such vessels as instrumentalities of interstate commerce."

It is obvious that the contrary is true here.

The case of *United Dredging Co. v. Los Angeles,* 10 F. (2d) 239, affirmed in 14 F. (2d) 364, holds that local authority may not enforce an ordinance requiring inspection and licensing of officers for the operation of steam dredges operating in the harbor. Language used by the district court as to the police power of the city seems to be entirely beyond the question involved and therefore requires no comment. The question actually decided makes the case an authority against the right of the state to interfere.

Cases are cited which sustain local laws fixing harbor charges and local laws as to liability for torts, but we cannot see their applicability; nor are the ferry cases in point here. The principle which must govern, we think, is laid down in *Harman v. Chicago,* 147 U. S. 396, 13 S. Ct. 306, where it was contended that a local municipality might, through license fees, exact compensation for the use of the harbor within its limits, which had been by it improved and made usable. After an exhaustive review of the previous decisions of the supreme court, Mr. Justice Field said:

"The license fee is a tax for the use of navigable waters, not a charge by way of compensation for any specific improvement. The grant to the city under which the ordinance was passed is a general one to all municipalities of the State. Waters navigable in themselves in a State, and connecting with other navigable waters so as to form a waterway to other States or foreign nations, cannot be obstructed or impeded so as to impair, defeat or place any burden upon a right to their navigation granted by Congress. Such

right the defendants had from the fact that their steam barges and towboats were enrolled and licensed, as stated, under the laws of the United States.''

So here, the license fee is a tax, and the other regulations, speaking generally, are all burdens upon navigation and to some extent upon interstate commerce.

We have examined with care those cases holding that state legislation as to matters wholly local, or intended to aid commerce, is permissible, such as *The Steamboat New York v. Rea,* 59 U. S. 223; *County of Mobile v. Kimball,* 102 U. S. 691, and other cases of like import. These are based upon the police power and are seemingly limited to strictly local affairs. Of the dozen or more things proposed to be done by the respondents under the state act, not one is purely local. Every one has a tendency to interfere with uniformity, and most of them are such as to constitute a burden upon interstate commerce.

We are satisfied that the act is invalid if applied to the navigable waters over which the Federal government has control. We are confirmed in this view by the fact that, in the twenty-nine years since its enactment, no real attempt has been made to enforce it against those operating vessels of any kind upon the navigable waters of the United States until the present controversy arose.

The judgment of the trial court is reversed, with instructions to enter judgment in conformity with the views expressed.

BEALS, HOLCOMB, STEINERT, and GERAGHTY, JJ., concur.

BLAKE, J. (dissenting)—The relators, some thirty-one companies, partnerships and individuals, operating power tugboats and towing vessels of less than sixty-five feet in length in navigable waters of this

state, brought this action in the superior court of Thurston county to obtain a writ of prohibition directed to E. Pat Kelly, as director of the department of labor and industries. The writ sought would prevent the director from enforcing or attempting to enforce any and all provisions of chapter 200, Laws of 1907, p. 425 (Rem. Rev. Stat., § 9843 [P. C. § 2880] *et seq.*), entitled:

"An Act regulating steam vessels, and vessels or boats operated by machinery, navigating the waters within the jurisdiction of this state, excepting vessels which are subject to inspection under the laws of the United States, and providing penalties for the violation thereof."

The cause was tried on issues joined by answer to the complaint. From judgment entered dismissing the action, relators appeal.

As indicated by what has been said, relators attack the validity of the act in its entirety. It is a mass attack on the whole of a legislative enactment. Under such circumstances, it is not the function of the court to "anticipate a question of constitutional law in advance of the necessity of deciding it." *Steamship Co. v. Emigration Commissioners,* 113 U. S. 33, 5 S. Ct. 352; *Abrams v. Van Schaick,* 293 U. S. 188, 55 S. Ct. 135; *Wilshire Oil Co. v. United States,* 295 U. S. 100, 55 S. Ct. 673. Nor will the court "decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States,* 196 U. S. 283, 25 S. Ct. 243; *Stephenson v. Binford,* 287 U. S. 251, 53 S. Ct. 181, 87 A. L. R. 721.

Under such an attack as made by relators, the question to be determined is whether *any* portion of the act is valid and enforcible. If any portion of the act is found valid and enforcible, the court should not extend the inquiry further nor undertake to say in

598

this action what portion of the act may be invalid and unenforcible. What was said in *Steamship Co. v. Emigration Commissioners, supra,* is peculiarly pertinent to the method of attack adopted by relators in this case:

"If, on the other hand, we should assume the plaintiff's case to be within the terms of the statute, we should have to deal with it purely as an hypothesis, and pass upon the constitutionality of an act of Congress as an abstract question. That is not the mode in which this court is accustomed or willing to consider such questions. It has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. These rules are safe guides to sound judgment. It is the dictate of wisdom to follow them closely and carefully."

As I proceed, I think it will be apparent why the question to be decided in this case should be so circumscribed.

The question, as circumscribed, dispenses with the necessity of analyzing chapter 200, Laws of 1907, p. 425 (Rem. Rev. Stat., § 9843 [P. C. § 2880] *et seq.*), in detail. As indicated by its title, it contains regulations with respect to the operation of automotive vessels in the navigable waters of this state. The act specifically disclaims any intent to control navigation or regulate vessels in any situation where Congress has enacted legislation upon the subject. Thus circumscribed, the problem resolves itself into two phases: (1) Does the maritime jurisdiction of the

United States preclude the state from enacting any regulatory legislation with respect to the operation of vessels on navigable waters within the boundaries of the state? (2) If not, are there any regulations prescribed by chapter 200, Laws of 1907, p. 425 (Rem. Rev. Stat., § 9843 [P. C. § 2880] *et seq.*), which cover a field not occupied by Federal legislation?

*First:* There can be no question but that the United States has primary jurisdiction over the navigable waters of this state. It is also without question that such jurisdiction is exclusive when exercised. In other words, a state may not legislate upon a subject within maritime jurisdiction if the United States has occupied the field. But it does not follow that a state may not legislate upon a subject within maritime jurisdiction when there is no Federal legislation on the subject.

In the case of *United Dredging Co. v. Los Angeles*, 10 F. (2d) 239, the rule is stated as follows:

"It may be admitted that reasonable police regulations may be imposed upon maritime craft, where considerations of safety are present in the locality under the jurisdiction of a municipality. Such regulations must be reasonable ones, and may be enforced, provided that the United States government has not already taken possession of the field in which it has primary jurisdiction. The law applicable was well stated by Judge Brown in *The City of Norwalk* (D. C.), 55 F. 98, where he said that the rule in favor of federal jurisdiction did not 'exclude general legislation by the states, applicable alike on land and water, in their exercise of the police power for the preservation of life and health, though incidentally affecting maritime affairs: Provided that such legislation does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations.'"

The rule as thus stated has ample support in decisions of the supreme court of the United States. *Sherlock v. Alling,* 93 U. S. 99; *County of Mobile v. Kimball,* 102 U. S. 691; *Pittsburg & Southern Coal Co. v. Louisiana,* 156 U. S. 590, 15 S. Ct. 459. In the case of *County of Mobile v. Kimball, supra,* it is said:

"The uniformity of commercial regulations, which the grant to Congress was designed to secure against conflicting State provisions, was necessarily intended only for cases where such uniformity is practicable. Where from the nature of the subject or the sphere of its operation the case is local and limited, special regulations adapted to the immediate locality could only have been contemplated. State action upon such subjects can constitute no interference with the commercial power of Congress, for when that acts the State authority is superseded. Inaction of Congress upon these subjects of a local nature or operation, unlike its inaction upon matters affecting all the States and requiring uniformity of regulation, is not to be taken as a declaration that nothing shall be done with respect to them, but is rather to be deemed a declaration that for the time being, and until it sees fit to act, they may be regulated by State authority."

Regulatory measures by states with respect to railroads engaged in interstate commerce have been upheld on the same principle. *Chicago, R. I. & P. R. Co. v. Arkansas,* 219 U. S. 453, 31 S. Ct. 275; *Vandalia R. Co. v. Public Service Commission of Indiana,* 242 U. S. 255, 37 S. Ct. 93. The former case involved the "full crew" act of the state of Arkansas. To the contention that the act was an obstruction to, or placed a burden on, interstate commerce, the court said:

"The validity under the Constitution of the United States of such statutes is not to be questioned in a Federal court unless they are clearly inconsistent with some power granted to the General Government or with some right secured by that instrument or

unless they are purely arbitrary in their nature. The statute here involved is not in any proper sense a regulation of interstate commerce nor does it deny the equal protection of the laws. Upon its face, it must be taken as not directed against interstate commerce, but as having been enacted in aid, not in obstruction, of such commerce and for the protection of those engaged in such commerce.''

*Second:* Now applying the principle of these cases to the facts of the case at bar, we find that the United States has not provided for the inspection of vessels less than sixty-five feet in length, either as to seaworthiness, safety of machinery or adequacy of crews. The relators operate vessels of less than sixty-five feet in length, which are therefore not subject to inspection under Federal laws. Section 9, p. 431 (Rem. Rev. Stat., § 9851 [P. C. § 2888]), of our act does provide for inspection and regulation of vessels in these respects. True, the provisions do not specifically refer to vessels of less than sixty-five feet in length, but they are none the less effective as to such vessels. Thus there is a field unoccupied by congressional legislation in which our act may be operative. To this extent at least, chapter 200, Laws of 1907, p. 425 (Rem. Rev. Stat., § 9843 [P. C. § 2880] *et seq.*), is valid and enforcible. Here the inquiry should stop, since we have found a field in which our act is valid and enforcible. It may be that some portions of our act are in conflict with now existing laws of the United States. If so, such portions of the act must give way. But the whole act does not therefore fall.

On this record, the court is not warranted in granting a writ of prohibition. Relators' rights may be amply protected in specific instances, if and when the director attempts to enforce provisions of the act which are in conflict with the laws of the United States.

For these reasons, I think the judgment should be affirmed.

MILLARD, C. J., MITCHELL, and MAIN, JJ., concur with BLAKE, J.